THIS DECISION IS A
PRECEDENT OF THE TTAB

Mailed: January 18, 2012

**UNITED STATES PATENT AND TRADEMARK OFFICE**
**Trademark Trial and Appeal Board**
_____

In re The Government of the District of Columbia
_____

Serial No. 77643857
Filed January 6, 2009
_____

Oral Hearing: July 7, 2011
_____

Bingham B. Leverich, Peter D. Trooboff, Marie A. Lavalleye, and Hope Hamilton, Covington & Burling LLP for applicant.

Charles L. Jenkins, Examining Attorney, Law Office 105, Thomas G. Howell, Managing Attorney.
_____

**Before Kuhlke, Cataldo, and Mermelstein, Administrative Trademark Judges.**

**Opinion by Mermelstein, Administrative Trademark Judge:**

The Trademark Act bars registration of any designation which "[c]onsists of or comprises the flag or coat of arms or other insignia of the United States, or of any State or municipality, or of any foreign nation, or any simulation thereof." Trademark Act § 2(b), 15 U.S.C. § 1052(b). In this case, the District of Columbia seeks to register a mark comprising its official seal, and the examining attorney has issued a final refusal to register.

This appeal[1] raises an issue of first impression: Does Trademark Act § 2(b) bar registration of such a mark when the applicant is a government entity seeking to register its own flag, coat of arms, or other insignia? We conclude that it does, and we accordingly affirm the refusal to register.

The applied-for mark is depicted in the subject application[2] as follows:



for "Clocks; Cufflinks; Lapel pins; Tie tacks," (Class 14);

"Desk sets; Holders for desk accessories; Holders for

---

[1] We also decide today *In re City of Houston*, __ USPQ2d __, App. No. 77660948 (TTAB Jan. 18, 2012), involving similar legal issues.

[2] The application was filed based upon the allegation of a bona fide intention to use the mark in commerce. The application contains the following description of the mark and translation:

- The mark consists of a female representation of Justice, holding a piece of parchment on which appears the word "Constitution", hanging a wreath on a statue of George Washington. The United States Capitol and a train appear behind the female, with an eagle in the front. The year "1871" appears within a wreath with a banner, and the words "JUSTITIA OMNIBUS" appear on the banner.

- The English translation of the word "JUSTITIA OMNIBUS" in the mark is "JUSTICE FOR ALL".

notepads; Memo pads; Notepads; Pen and pencil cases and boxes; Pencils; Pens" (Class 16); "Coasters not of paper and not being table linen; Cups and mugs," (Class 21); and "Hats; Polo shirts; Sweat pants; Sweat shirts; T-shirts," (Class 25).

## I.    Preliminary Issues

Applicant attached a number of exhibits to its brief on appeal; the examining attorney objects to consideration of them.[3]  This evidence falls into two categories; evidence regarding three third-party trademark registrations which were listed in applicant's response to the first Office action and were the subject of a remand, and evidence regarding fourteen other registrations.

The relevant rule provides that:

> The record in the application should be complete prior to the filing of an appeal.  The Trademark Trial and Appeal Board will ordinarily not consider additional evidence filed with the Board by the appellant or by the examiner after the appeal is filed.  After an appeal is filed, if the appellant or the examiner desires to introduce additional evidence, the appellant or the examiner may request the Board to suspend the appeal and to remand the application for further examination.

---

[3] Applicant filed its papers in this appeal via ESTTA, the Board's electronic filing system, and also sent hard copies of the filings to the Board by mail.  Parties should not file by mail hard copy duplicates of ESTTA filings.  TRADEMARK TRIAL AND APPEAL BOARD MANUAL OF PROCEDURE ("TBMP") § 110.09 (3d ed. 2011).

Trademark Rule 2.142(d).

In its response to the first Office action, applicant had listed three third-party registrations in support of its argument. Resp. at 9 (Sept. 16, 2009). Copies of the registrations from the USPTO's records were not filed with the response, as is required in order to make the registrations of record. *E.g. In re Smith and Mehaffey*, 31 USPQ2d 1531, 1532 n.3 (TTAB 1994). However, the examining attorney did not object to the listing or advise applicant that such a listing is not an appropriate means to make the listed registrations of record.

After filing its notice of appeal, applicant filed a combined request to extend its time to file a brief and for remand to introduce copies of the three previously-listed third-party trademark registrations for consideration by the examining attorney. The Board found good cause for applicant's remand request (making the request to extend moot), and returned the file to the examining attorney for consideration of the three attached third-party registrations. Order (June 9, 2010).

On remand, the examining attorney denied applicant's request for reconsideration, stating that "no new facts or reasons have been presented that are significant or compelling with regard to the point at issue." The

4

examining attorney also objected to consideration of the three registrations, pointing out that the Office had "consented only to the additional time for applicant to file its appeal [brief]." Recon. Denied (Aug. 5, 2010).

Following denial of reconsideration, the case was returned to the Board for resumption of the appeal, and applicant filed its brief. Attached to applicant's appeal brief were seventeen third-party registrations, including the three which were the subject of applicant's remand, App. Br. Appx. Tabs 1-3, and fourteen others, *id.* Tabs 4-17. The examining attorney objected to all of this evidence in his responsive brief. In its reply brief, applicant responded to the objection:

> There is no dispute that the additional 14 registrations were not part of the record before this appeal. Moreover, and contrary to the Examining Attorney's assertion, Applicant did not "request[] a remand in its appeal brief" for additional consideration of these registrations. It is nevertheless within the Board's discretion to consider these registrations because, in the Examining Attorney's own words, they raise "no new facts or reasons" and thus are not prejudicial and merely demonstrate more fully the breadth of the PTO's inconsistent application of Section 2(b).

Reply Br. at 4 (citations omitted).

The examining attorney's objection to the three trademark registrations which were the subject of applicant's request for remand is overruled. Opposer's

5

Serial No. 77643857

request for remand sought both an extension of time to file its brief and a remand to introduce these registrations for further examination. Although the managing attorney apparently consented only to the extension of time,[4] the Board may grant an applicant's request for remand upon a showing of good cause with or without the consent of the examining or managing attorney – or, indeed, over their objection. Once the Board granted applicant's request and remanded the file to the examining attorney for consideration of this evidence, the three third-party registrations which were the subject of the remand request became part of the record.

The situation is different with respect to the evidence of the fourteen additional registrations. App. Br. Appx. Tabs 4-17. As applicant admits, at the time they were filed as attachments to applicant's brief, these registrations were not part of the record, either prior to appeal or submitted pursuant to our remand order. The Board will generally not consider evidence in the first

---

[4] Contrary to the examining attorney's contention, Ex. Att. Br. at 6-7, applicant did not misrepresent to the Board that the examining or managing attorney consented to the request for remand. Applicant recited the Managing Attorney's consent in connection with the requested extension of time. Applicant also requested remand, but did not allege that the examining or managing attorney had consented thereto.

6

instance; that is the job of the examining attorney.

Evidence which has not been presented to the examining

attorney during examination or on remand will ordinarily

not be considered on appeal.  Trademark Rule 2.142(d).

Applicant had at least three opportunities to submit

any evidence it believed relevant for consideration by the

examining attorney:  (1) in response to the first office

action; (2) with a request for reconsideration filed within

six months of a final Office action (such a request was not

filed in this case); or (3) with its request for remand.

Applicant provided no explanation of why this evidence was

not timely submitted and no good reason[5] for our

---

[5] As noted previously, applicant argues that

> [i]t is ... within the Board's discretion to consider
> these registrations because, in the Examining
> Attorney's own words, they raise "no new facts or
> reasons" and thus are not prejudicial and merely
> demonstrate more fully the breadth of the PTO's
> inconsistent application of Section 2(b).

Reply Br. at 4.  The "no new facts or reasons" statement
applicant quotes comes from the examining attorney's denial of
the request for reconsideration.  But as applicant admits, this
evidence was not then before the examining attorney, so the
quoted statement could not have referred to it.

 Moreover, applicant's citation of *In re Boyd Gaming Corp*., 57
USPQ2d 1944, 1945 n.2 (TTAB 2000), is inapposite.  *Boyd*, like the
subsequent case of *In re Broyhill Furniture Indus. Inc*., 60
USPQ2d 1511 (TTAB 2001), concerned whether and to what extent
registrations which were merely listed in an Office action
response could be considered on appeal when the examining
attorney did not object to the list during examination.  As was
clear from *Broyhill*, the examining attorney's failure to timely
object to the admissibility of the *list* results in a waiver of
any objection to consideration of it, and *the list itself* may be

consideration of it on appeal in derogation of Trademark

Rule 2.142(d).

In sum, the examining attorney's objection is

overruled with respect to the three registrations which

were the subject of applicant's request for remand, and

sustained as to the other fourteen registrations.

## II.  Trademark Act § 2(b)

It is the examining attorney's position that

Trademark Act § 2(b) prohibits registration of official

insignia, even by the relevant governmental entity.  In

response, applicant argues that Section 2(b) should be

interpreted as including an exception for governmental

---

considered by the Board on appeal "for whatever limited probative value such evidence may have."  *Broyhill*, 60 USPQ2d at 1513 n.3. Neither *Boyd* nor *Broyhill* permit the submission of full copies of the registrations on appeal, nor do they suggest that the failure to object to the mere listing of three third-party registrations is a waiver to the submission of proper copies of any and all *other* registrations on appeal.  *See City of Houston*, slip op. at 6 n.7.  In the case at bar, applicant had listed during examination the three registrations that were the subject of the remand.  But the fourteen additional registrations submitted with applicant's brief were not listed during examination or remand, so the examining attorney could not have objected to them and the lack of any such objection cannot be construed as a waiver.

Applicant cannot claim surprise at this result, as it clearly understood the rules.  When it filed its request for remand, applicant stated that it had referenced the three registrations during examination, but had "inadvertently omitted" copies of them, thus recognizing that they had not been properly submitted. Req. for Remand at 1-2.  It is not clear why applicant did not also request the opportunity to submit the additional fourteen registrations at that point, but having made that choice, applicant may not bypass examination and submit them for the first time on appeal.

entities seeking to register their own insignia, and bases much of its argument on its theory of what Congress did (and did not) intend in enacting Section 2(b), and how the statute should be interpreted in light of that intent.

While Congressional intent is clearly a central inquiry in statutory interpretation, we must begin by analyzing the words of the statute itself. *Milner v. Dep't of Navy*, 131 S. Ct. 1259, 1264 (2011); *Park 'N Fly v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 224 USPQ 327, 329 (1985) ("Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose."). Our search for Congressional intent is highly constrained, however, for if the statutory language is clear, our inquiry is usually at an end because Congress is presumed to have intended exactly what was enacted. *United States v. Clintwood Elkhorn Mining Co.*, 553 U.S. 1, 11 (2008) ("The strong presumption that the plain language of the statutes expresses congressional intent is rebutted only in rare and exceptional circumstances." (quotation marks, alterations, and citations omitted)); *Holmes Group Inc. v. Vornado Air Circulation Sys. Inc.*, 535 U.S. 826, 62 USPQ2d 1801, 1804 (2002) ("Our task here is not to determine what would

9

further Congress's goal of ensuring patent-law uniformity, but to determine what the words of the statute must fairly be understood to mean."); *Xianli Zhang v. United States*, 640 F.3d 1358, 1364 (Fed. Cir. 2011) ("If the statute is clear and unambiguous, then the plain meaning of the statute is conclusive, and we give effect to the unambiguously expressed intent of Congress." (citations and quotation marks omitted)). As Justice Holmes famously put it, "[w]e do not inquire what the legislature meant; we ask only what the statute means." Oliver Wendell Holmes, Jr., *The Theory of Legal Interpretation*, 12 Harv. L. Rev. 417, 419 (1899). We add that in this case, the paucity of documents evidencing Congressional intent on this provision limits this aspect of our statutory analysis. *See* note 22, *infra*.

Finally, we keep in mind that statutory language must be construed not in isolation, but with reference to the context in which it appears. *Koons Buick Pontiac GMC, Inc. v. Nigh,* 543 U.S. 50, 60 (2004) ("Statutory construction is a holistic endeavor." (quotation marks and citations omitted)); *In re Nantucket, Inc.*, 677 F.2d 95, 213 USPQ 889, 892 (CCPA 1982) ("Each part or section of a statute should be construed in connection with every other part or section so as to produce a harmonious whole.").

### A.    Statutory Provisions

The relevant statutory language provides as follows:

> No trademark by which the goods of the applicant may be distinguished from the goods of others shall be refused registration on the principal register on account of its nature unless it—
>
> ...
> Consists of or comprises the flag or coat of arms or other insignia of the United States, or of any State or municipality, or of any foreign nation,[6] or any simulation thereof.

Trademark Act § 2(b).

The quoted provision is substantially similar to a provision of the Trademark Act of 1905, which reads as follows:

> [N]o mark by which the goods of the owner of the mark may be distinguished from other goods of the same class shall be refused registration as a trade-mark on account of the nature of such mark unless such mark
>
> ...
> Consists of or comprises the flag or coat of arms or other insignia of the United States or any simulation thereof, or of any State or municipality or of any foreign nation....

Trademark Act of 1905, § 5, ch. 592 § 5, 33 Stat. 724

(1905) (repealed 1946).

---

[6] For ease of reference, we refer generally to "the flag or coat of arms or other insignia of the United States or of any State or municipality, or of any foreign nation" (and to their equivalent in the 1905 statute and the Paris Convention) as governmental or official insignia.

### B.    Construction

We find the quoted language of the current statute –
and that of its predecessor – to be plain and clear on its
face.  Reversing the negative syntax of Section 2, we read
the quoted subsection to bar registration of any mark which
is or includes the "coat of arms or other insignia of ...
any ... municipality."  While the text does not resolve all
definitional issues (*i.e.*, what constitutes "other
insignia" or a "simulation"), those questions are not at
issue in this case.[7]  Further, we find the statute to be
uniform in its applicability.  The text of the statute
offers no exception to the prohibition on registration,
even when a governmental entity applies to register its own

---

[7] While our precedent interprets what constitutes official
insignia under Trademark Act § 2(b) narrowly, *In re U.S. Dep't of
the Interior*, 142 USPQ 506, 507 (TTAB 1964) (logo of National
Park Service held not to be an insignia of the United States);
*U.S. Navy v U.S. Mfg. Co.*, 2 USPQ2d 1254, 1256 (TTAB 1987)
("USMC" held not to be a flag, coat of arms, or other insignia),
in this case applicant affirmatively states that its applied-for
mark comprises the official seal of the District of Columbia.

Moreover, while the District of Columbia is neither a state nor
part of a state, *see* U.S. CONST. art. I, § 8, cl. 17, it is
clearly a "municipality," as that word is commonly defined.  *See*
BLACK'S LAW DICTIONARY, 918 (5th ed. 1979) ("A legally incorporated
or duly authorized association of inhabitants of limited area for
local governmental or other public purposes."), of which we take
judicial notice.  As applicant notes, "the District of Columbia
government is 'constituted a body corporate for municipal
purposes, and may ... exercise all the powers of a municipal
corporation.'"  App. Br. at 9 (*quoting* the Organic Act of 1871,
ch. 62, 16 Stat. 419 (1871)).

12

official insignia.[8]

Applicant argues that Congress did not intend such a result, and we consider applicant's arguments regarding legislative intent in detail below.  But the first and most obvious response to applicant's arguments is that we must presume Congress to know how to write legislation to effect its own intent.  As the Supreme Court said long ago,

> [t]he primary and general rule of statutory construction is that the intent of the lawmaker is to be found in the language that he has used.  He is presumed to know the meaning of words and the rules of grammar.  The courts have no function of legislation, and simply seek to ascertain the will of the legislator.  ...  No mere omission, no mere failure to provide for contingencies, which it may seem wise to have specifically provided for, justify any judicial addition to the language of the statute.

*United States v. Goldenberg*, 168 U.S. 95, 102-03 (1897).

Because applicant's proposed exception does not appear in the statutory text, and is in fact contrary to the statutory text and construction, as discussed below, we will not presume that Congress intended such an exception

---

[8] Shortly after passage of the 1946 Act, one commentator noted that Section 2 sets out various prohibitions to registration. "Some of these prohibitions are absolute in character, while others are relative or 'temporary.'  In the first category belong the provisions which prohibit the registration of immoral, deceptive, or scandalous matter, or marks comprising the flag or coat of arms."  Walter J. Derenberg, *The Patent Office as Guardian of the Public Interest in Trade-Mark Registration Proceedings*, 31 J. PAT. & TRADEMARK OFF. SOC'Y 647 (1949).

to apply.

This is all the more clear when we consider Section 2(b)'s neighboring subsections, Trademark Act §§ 2(c) and 2(d), both of which do feature exceptions similar to that which applicant seeks here. Trademark Act § 2(c) prohibits registration of the "name, portrait, or signature" of a "living individual" or deceased president "during the life of his widow," *except by the individual's or widow's consent*. Such individuals may thus register their own name, portrait, or signature, *Alford Mfg. Co. v. Alfred Elec.*, 137 USPQ 250 (TTAB 1963), *aff'd*, 333 F.2d 912, 142 USPQ 168 (CCPA 1964) (signature of application constitutes "consent" to registration of one's own name, portrait, or signature), or consent to such registration by others.

Similarly, Trademark Act § 2(d) prohibits registration of marks which would be likely to confuse, but only if the prior mark is used or registered "*by another*." Thus an applicant may register a mark notwithstanding that it is similar to its own registered or previously used marks. If there were any doubt on the question, these provisions demonstrate that Congress is fully capable of expressly exempting certain persons from the statutory prohibitions

to registration when it intends to do so.[9]

Moreover – to the extent it matters – neither the Trademark Act in general nor Section 2 in particular features an overly-complicated statutory structure; it seems unlikely that the absence of applicant's exception was an oversight or drafting error. Indeed, as applicant points out, the prohibition against registration of governmental insignia has been part of U.S. trademark law for over 100 years. Congress has revisited the trademark law a number of times during the past century (including a major revision in 1946 in which what is now Section 2(b) was modified slightly), all without providing for the proposed exception. Against that background, we find it very difficult to believe that Congress intended such an exception, but failed to provide explicitly for it by legislation.

Finally, we note that our construction of Trademark

---

[9] Applicant's construction of Trademark Act § 2(b) also seems inconsistent with Trademark Act §§ 2(f) (acquired distinctiveness), and 23 (Supplemental Register). Both provisions permit registration of some otherwise unregistrable marks. However, both sections expressly exclude their application to marks which would be unregistrable under Trademark Act § 2(b). If Congress intended that governments be permitted to register their own official insignia as trademarks, it is not at all clear why the benefits of Trademark Act §§ 2(f) and 23 are not extended to such marks. On the other hand, the exclusion of such marks in Trademark Act §§ 2(f) and 23 is entirely logical if Section 2(b) is read as an absolute bar to registration.

Act § 2(b) is consistent with the USPTO's interpretation of the section: "The statute does not list any exceptions that would allow for countries, states, or municipalities to register their own flags or insignia. Applications for marks that contain flags, coats of arms, or government insignia, even if filed by the relevant state, country, or municipality, must be refused."[10] TRADEMARK MANUAL OF EXAMINING PROCEDURE ("TMEP") § 1204.04(a) (8th ed. 2011).

### C. Applicant's Arguments

Under several different theories, applicant argues that we should read Trademark Act § 2(b) as including an exception, namely that when the applicant is the governmental entity referred to in Section 2(b), registration should not be refused on account of Section 2(b). We consider applicant's arguments in turn.

### 1. Congressional Intent

Applicant argues that we must construe Trademark Act § 2(b) in light of Congress' intention in adopting it.

---

[10] The quoted text first appeared in the Sixth Edition of the TMEP, issued October 12, 2009, based on identical language in an Examination Guide issued in 2007. Exam. Guide 2-07, *Section 2(b) - Flags and Government Insignia*, p.5 (Nov. 27, 2007). Examination Guides are publically available on the USPTO website and constitute official interim guidance for the examination corps and the public prior to incorporation of the material in the TMEP. *See* www.uspto.gov/trademarks/resources/index.jsp (Jan. 9, 2012).

Applicant advances two primary arguments with respect to legislative intent. First, applicant contends that what is now Trademark Act § 2(b) was originally enacted with the intent of implementing the Paris Convention, and that the intent of the Paris Convention was to prevent others from registering the official insignia of governments, not to prevent those governments from registering their own insignia. Applicant therefore argues that we should construe the statute as barring registration *except* upon application of the governmental authority itself. Second, applicant argues that the purpose of Trademark Act § 2 is the avoidance of confusion. And since no confusion would result from a government's registration of its own official insignia, we should construe Section 2(b) to include an exception allowing such registration.

### a.    The Paris Convention

Applicant argues that what is now Trademark Act § 2(b) has its origins in a multilateral treaty signed nearly 130 years ago.[11] International Convention for the Protection of Industrial Property, Mar. 20, 1883, 25 Stat. 1372, T.S. 379

---

[11] Under an alternative theory of the history of Trademark Act § 2(b), the applicant in *City of Houston* contends that the provision was an early attempt at a statute preventing flag desecration. *City of Houston*, slip op. at 10-12. As discussed in that case, this alternative theory does not yield a different result.

("Paris Convention"). Applicant argues that Section 5 of the Trademark Act of 1905 was (to the extent relevant here) enacted to implement the Paris Convention, and further, because the Paris Convention was not intended to bar governmental authorities from registering their own official insignia, we should similarly assume that Congress, in implementing the Paris Convention, likewise did not intend to bar such registrations.

Among other provisions relating to patents and trademarks, the 1883 text of the Paris Convention provided as follows:

### ARTICLE VI

...
The deposit may be refused, if the object, for which it is asked, is considered contrary to morals and to public order.

Paris Convention, art. 6 (1883). In a protocol accompanying the signature of the convention, the signatories further agreed as follows:

### FINAL PROTOCOL

**4.** ... In order to avoid all misinterpretation, it is understood that the use of public armorial bearings and decorations may be considered contrary to public order, in the sense of the final paragraph of Article 6.

Paris Convention, Final Protocol art. 4 (1883).

Following advice and consent of the Senate, the Paris

Convention entered into force as to the United States on

May 30, 1887.  The treaty has been modified a number of

times since 1883, including revisions at Brussels in 1900

which did not change the provisions of Article 6 or the

Final Protocol quoted above.  The next revision resulted

from a conference in Washington, D.C. in 1911.  The

Washington text provides in relevant part:

### ARTICLE 6.

Every trademark regularly registered in the
country of origin shall be admitted to
registration and protected as that in the other
countries of the Union.

However, there may be refused or invalidated:

...
**3.** Marks which are contrary to morals or public
order.

### FINAL PROTOCOL

...

### AD ARTICLE 6.

It is understood that the use of badges,
insignia or public decorations which shall not
have been authorized by competent powers, or the
use of official signs and stamps of control and
of guaranty adopted, by a unionist country, may
be considered as contrary to public order in the
sense of No. 3 of Article 6.

However, marks, which contain, with the
authorization of competent powers, the
reproduction of badges, decorations or public
insignia, shall not be considered as contrary to
public order.

Paris Convention, as modified at Washington, June 2, 1911,

37 Stat. 1645, T.S. 579 ("Washington Act"). The quoted provision of the Final Protocol was eventually merged into the text of the treaty, the result becoming Article 6*ter*, which first appeared following a conference at The Hague. Paris Convention, as modified at The Hague, Nov. 6, 1925, 47 Stat. 1789, T.S. 834. As eventually amended, the provision appears in the current text of the treaty as follows:

## Article 6*ter*

### Marks: *Prohibitions concerning State Emblems, Official Hallmarks, and Emblems of Intergovernmental Organizations*

(1) (a) The countries of the Union agree to refuse or to invalidate the registration, and to prohibit by appropriate measures the use, without authorization by the competent authorities, either as trademarks or as elements of trademarks, of armorial bearings, flags, and other State emblems, of the countries of the Union, official signs and hallmarks indicating control and warranty adopted by them, and any imitation from a heraldic point of view.

Paris Convention, art. 6*ter*, as modified at Stockholm, July 14, 1967, 21 U.S.T. 1583; 828 U.N.T.S. 303 ("Stockholm Act").

The current text of the Paris Convention does not require signatory states to prohibit the registration of official insignia if registration has been authorized by the relevant government authority. But it is also worth

noting that this was not so until 1911, well after the passage of § 5 of the Trademark Act of 1905. Prior to then, the provisions regarding the refusal of registration of government insignia as trademarks made no mention of registration with authorization, suggesting instead that such a ban was to be applied to all such marks regardless of authorization or the identity of the applicant. *See* Paris Convention, art. 6, Final Protocol art. 4 (1883).

Thus, applicant's argument that the relevant provision of the 1905 Act – which was carried forward with little change in § 2(b) of the Trademark Act of 1946 – reflected Congress' intent to adopt the arguably more permissive approach to registration of official insignia when authorized by the relevant governmental authority, as found in the current text of the Paris Convention, is not supported by the facts. Indeed, the facts imply the opposite. If anything might be presumed from this sequence about Congressional intent, it might well be that the relevant provision of the 1905 Act was instead adopted intentionally to enact the more restrictive approach taken by the 1883 text of the treaty, which was in effect in 1905, the year Congress passed the predecessor of Trademark Act § 2(b).

Article *6ter* of the (current) Paris Convention does

not *require* the United States to bar registration of governmental insignia if they are authorized, and presumably, by extension, it would not require prohibition when the governmental authority is itself the applicant, *i.e.*, granting itself permission to register.  But that is of no help to applicant here.  First, the Paris Convention is not self-executing, so we must look for authority to whatever provisions Congress has made in implementing the treaty, and the treaty itself creates no rights that can be directly relied upon by applicants in the United States. *In re Rath*, 402 F.3d 1207, 74 USPQ2d 1174, 1175-76 (Fed. Cir. 2005) (*quoting Kawai v. Metlestics*, 480 F.2d 880, 178 USPQ 158, 161 (CCPA 1973)).[12]  And second, even if the treaty were self-executing, the only relevant *requirement* in Article 6*ter* is that signatory states "*refuse* ... the registration ... without authorization by the competent authorities, ... as trademarks, ... armorial bearings, flags, and other State emblems...."  Paris Convention, Stockholm Act, art. 6*ter* (emphasis added)*.*  The language of this provision does not require member states to register

---

[12] Applicant notes that "[t]here are conflicting views as to whether the Paris Convention is a self-executing treaty."  App. Br. at 11 n.7.  Whatever the state of the law in other circuits, we are bound by the decisions of the Federal Circuit (and its predecessor, the Court of Customs and Patent Appeals), which directly reviews our decisions on appeal.

such marks which are authorized, nor does it prohibit

signatory states from adopting different or more

restrictive rules not inconsistent with it.  Thus, the

clear meaning of Trademark Act § 2(b) is not inconsistent

with the requirements of the Paris Convention, and does not

violate U.S. treaty obligations.

Finally, applicant points to the trademark statutes of

the United Kingdom and Canada, both signatories of the

Paris Convention, and both of which provide the exception

which applicant asks us to apply to U.S. law.  App. Br. at

6 n.1.  Applicant urges us to interpret our laws consistent

with those of other signatories of the Paris Convention.[13]

We note, however, that the United Kingdom and Canada have

each explicitly set out the exception in the text of their

---

[13] Applicant cites a comment by Justice Scalia during oral
argument in *Abbot v. Abbot*, 130 S. Ct. 1983 (2010), suggesting
that ambiguous treaty terms should be construed giving
"considerable weight" to "the opinions of our sister
signatories."

Comments by a single justice during oral argument are not law,
and the Paris Convention is very different from the Hague
Convention on the Civil Aspects of International Child Abduction,
which was at issue in *Abbot*.  We note that the Court's ultimate
decision in *Abbot* relied on a definition in the treaty itself,
providing a "uniform, text-based approach [which] ensures
international consistency in interpreting the Convention."  *Id.*
at 1991.  In the case at bar, the Paris Convention does not
itself provide a definitive answer to the question at hand,
taking a permissive, rather than a prescriptive approach, nor is
there the same need for international consistency as there is in
the procedure applicable in cases of child abduction, where
inconsistency could lead to forum-shopping.  *See id.* at 1996.

trademark statute.  Neither country's statute is evidence that the Paris Convention requires such an exception, and the fact that both have established the exception through domestic legislation provides no support for the notion that we should or could read the exception into the U.S. law *contrary to* our domestic legislation.

### b.   U.S. Law

In addition to relying on the Paris Convention, applicant advances several other theories focusing on domestic law.

Applicant first notes that in passing the 1905 Act, Congress generally stated that

> Section 5 of the proposed bill we believe will permit the registration of all marks which could, under the common law as expounded by the courts, be the subject of a trade-mark and become the exclusive property of the party using the same as his trade-mark.

App. Br. at 8 (*quoting* S. Rep. No. 58-3278 at 8 (1905); H.R. Rep. No. 58-3147 at 7 (1904)).  Applicant adds that the official seal which it has applied to register "is obviously a mark that [applicant] owns...,"[14] App. Br. at 9,

---

[14] Applicant may be correct that the subject matter of the registration is a "trademark" that applicant "owns."  We need not reach that question, as the only issue before us is whether registration may be refused under Trademark Act § 2(b).  However, the conclusion is not as obvious as applicant suggests.  There is at least some thought that official insignia are not trademarks

at all, at least not trademarks in the usual sense: "[Article 6*ter* of the Paris Convention] concerns *trademarks*, but its purpose is not to regulate their *protection as subjects of industrial property* but rather to *exclude them from becoming such subjects* in certain circumstances." G.H.C. BODENHAUSEN, GUIDE TO THE APPLICATION OF THE PARIS CONVENTION FOR THE PROTECTION OF INDUSTRIAL PROPERTY, 95 (1969). *See In re Am. Glue Co.*, 27 App. D.C. 391 (D.C. Cir. 1906) ("[N]o person has had, in the sense of [the 1905 Act], an 'exclusive use' of the Great Seal of the United States, and no person can claim a prescriptive right to use a mark prohibited by law.")

Even prior to passage of the 1905 Act, there was significant concern over use of governmental insignia in trademarks not, for the most part because of any potential for confusion or desire to comply with the Paris Convention, but because it was felt that such symbols ought not be the subject of commerce at all. *See, e.g.*, *Ex parte Ball*, 98 O.G. 2366 (Comm'r 1902) (application for registration of trademark comprising depictions of the U.S. flag and seal refused: "It is contrary to public policy to detract in any way from the honor which is due to the flag. This result certainly follows from its use as an advertisement in trade, and such use is not to be aided or encouraged by this Office."); *Ex parte Standard Fashion Co.*, 89 O.G. 189 (Comm'r 1899) ("It is conceded that the representation of the United States flag *per se* is not permissible. ...I think that its use in trade as a mark for goods does not tend to add to its glory."). *Cf. Armstrong Paint & Varnish Works v. Nu-Enamel Corp.*, 305 U.S. 315, 326 (1938) (noting in passing that such marks are *infra dignitatem*).

A number of states passed laws prohibiting commercial use of official insignia for similar reasons. *See e.g. Halter v. State*, 105 N.W. 298, 299-300 (Neb. 1905) ("It is a matter of common knowledge that the use of the flag for advertising purposes offends the sensibilities of a large portion of our people. ... The flag is the emblem of national authority. To the citizen it is an object of patriotic adoration, emblematic of all for which his country stands – her institutions, her achievements, her long roster of heroic dead, the story of her past, the promise of her future; and it is not fitting that it should become associated in his mind with any thing less exalted, nor that it should be put to any mean or ignoble use."), *aff'd* 205 U.S. 34 (1907) (Use in commerce "tends to degrade and cheapen the flag in the estimation of the people, as well as to defeat the object of maintaining it as an emblem of national power and national honor."); *People ex rel. McPike v. Van de Carr*, 70 N.E. 965 (N.Y. 1904); *Ruhstrat v. People*, 57 N.E. 41 (Ill. 1900); *Commonwealth v. Sherman Mfg. Co.* 75 N.E. 71 (Mass. 1905).

Applicant's intended use of its own official seal as a trademark could be viewed as inconsistent with sentiment prevailing at the time the prohibition was written into § 5 of

and therefore refusal of applicant's registration is inconsistent with the legislative intent embodied in Section 5 of the 1905 Act and Section 2(b) of the 1946 Act.

We agree that Trademark Act § 2, (like Section 5 of the 1905 Act), generally embodies a liberal standard of registration. Nonetheless, it is still a standard, and registration of some marks is clearly prohibited by the express terms of the statute. There is simply no authority which would support using a brief, general expression of legislative intent to override a clear and specific statutory bar to registration.

Applicant also points to language in Section 2(b) which prohibits not only registration of official insignia, but also "any simulation thereof." "A government entity would have no reason to register a 'simulation' of its official insignia," and even if it did, such registration would not cause deception or confusion, the prevention of which is, according to applicant, a "central purpose of all of the subparagraphs of Section 2...." Reply Br. at 6. Applicant argues that this reflects an intent that the statute not be interpreted to prohibit government registration of its own insignia. Reply Br. at 6-7.

---

the 1905 Act and after, namely, that governmental insignia ought not be the subject of commerce.

There are several problems with applicant's position. First, even assuming that the "simulation" language is aimed solely at third parties, rather than at governments themselves, it does not stand to reason that the rest of the subsection is aimed solely at third parties. By its terms, the statute prohibits registration of (1) the described official insignia; and (2) "any simulation thereof." Even if the "simulation" language would as a practical matter apply only to third parties, there is no logical reason why that practical limitation on the effect of the prohibition on registration of simulations must necessarily be read to limit the prohibition on registration of the actual government insignia. To the contrary, the statute's mention of both official insignia and simulations plainly reads as a ban on registration of both; one does not limit the other.

Second, applicant's narrow focus on confusion is misplaced. The prevention of confusion or deception is not the only concern of Trademark Act § 2. That section sets out a number of grounds for refusal of registration that have nothing to do with confusion. For example, Trademark Act § 2(a) prohibits registration of immoral or scandalous

27

matter,[15] and Section 2(e) sets out a variety of subject matter which is not registrable because – for various reasons – it is not considered to be a trademark – at least not without a showing of distinctiveness.

In fact, if prevention of confusion were the "central purpose" of Trademark Act § 2(b), it would be superfluous, because registration of marks which would cause confusion is prohibited under Trademark Act § 2(d), and Trademark Act § 2(a) prohibits registration of marks which would be deceptive or falsely suggest a connection with others. To the contrary, rather than simply being a special case of confusion, registration of governmental insignia is prohibited by Trademark Act § 2(b) <u>regardless</u> of whether confusion would result. We conclude that neither the

---

[15] These provisions are similar to the language of the 1883 text of the Paris Convention, which allowed member states to refuse registration if the proposed mark "is considered contrary to morals and to public order," Paris Convention, art. 6(3) (1883), and which defined official insignia as "contrary to public order...," *id.*, Final Protocol art. 4 (1883).

The original text of the Paris Convention (in place when the 1905 Trademark Act was passed) could be read as disapproving as inappropriate the use of official insignia as the subject matter of trademarks used in commerce, entirely apart from any concerns about customer confusion. Such reading would be compatible with the contemporaneous U.S. case law. *See supra* n. 14. To the extent such attitudes have since changed, such change may be a valid reason to urge Congress to revisit this issue, but it does not provide justification for an administrative agency to ignore or rewrite the law. We offer no opinion on whether prevailing attitudes have changed or whether legislative action would be appropriate. But to the extent applicant's complaint lies with the express terms of the statute, we can provide no remedy.

"simulations thereof" language in Section 2(b), nor applicant's contention that registration of such marks would not cause confusion is sufficient to show that Congress intended the exception applicant seeks.

### 2.    Trademark Act § 2(b) is Unambiguous

When a statute is unambiguous, we presume that the intent of the legislature was expressed in the clear words of the statute itself.  Ex. Att. Br. at 4-5 (unnumbered) (citing *Pequignot v. Solo Cup Co.*, 95 USPQ2d 1501, 1505-06 (Fed. Cir. 2010) ("Solo's argument is unavailing, however, as we need not resort to legislative history when a statute is unambiguous.  *See Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 254 (1992) (rejecting consideration of legislative history because statutory language was unambiguous).")).

Applicant belatedly recognizes this issue, arguing for the first time in its reply brief[16] that Trademark Act § 2(b) is ambiguous on its face, is ambiguous as applied, and that resort to legislative history would be appropriate even if the statute were unambiguous.

The argument that Section 2(b) is ambiguous on its

---

[16] The examining attorney did not mention it until his brief on appeal, either.  However, it is the applicant, not the examining attorney, that is advancing an argument based on legislative history.  Thus applicant's arguments justifying consideration of the legislative history should have been made in its main brief, if not during examination.

29

face is essentially applicant's argument, discussed above, that the inclusion of the words "any simulation thereof" expresses a clear intent that the provision apply only to third parties despite the clear terms of the statute. Reply Br. at 6-7. Again, we disagree. There is nothing unclear, inconsistent, or illogical about this language, and it does not evidence a legislative intention that the bar to registration not apply to government entities seeking to register their own official insignia. Indeed, to read in such an exclusion would be incompatible with the structure of the rest of the Act where exclusions are specifically delineated. *See* II.B, *supra*.

Applicant further argues that the statute is ambiguous "as applied," as demonstrated by "the inconsistent interpretation of Section 2(b) by various PTO examining attorneys and this Board...."[17] Applicant points to the

---

[17] Applicant's theory tends to undermine the relationship between the different branches of government. If Congress has drafted a clear and unambiguous statute, that statute does not somehow become ambiguous because of assertedly incorrect application of it by an administrative agency. Those individual administrative decisions may be correct or incorrect, but they cannot transform the words of the statute so as to render obscure what was once clear. To the contrary, to determine whether the statute is ambiguous, we look to the statute itself. And if the statute is clear, we need look no further.

The cases applicant cites are not to the contrary. In *Gunther v. Cty. of Washington*, 623 F.2d 1303 (9th Cir. 1979), the court noted that inconsistent treatment of the statute in question by other courts "underscores [its] ambiguity." *Id*. at 1320-21.

three registrations it submitted on remand to the examining attorney (plus the fourteen others attached to its brief, which we have excluded), as well as this Board's decision in *In re U.S. Dep't of the Interior*.

Again, we disagree. As mentioned above, the issue before us is one of first impression with the Board. The question we faced in *Department of the Interior* was the registrability of the following logo of the National Park Service:



The Board held that the inclusion in Trademark Act § 2(b) of "other insignia of the United States" did not bar registration of *any* device used by a government or an agency of the government. Rather, we concluded that as used in Trademark Act § 2(b),

---

Thus the court treated inconsistent application of the statute (here by sister circuits, not an administrative agency) as confirming the ambiguity it found. But the ambiguity in *Gunther* was not created by the inconsistent court decisions, but by Congress. The situation in *Marathon LeTourneau Co. v. Nat'l Labor Relations Bd.*, 414 F. Supp. 1074 (S.D. Miss. 1976), was largely the same; different treatment by other courts confirmed an ambiguity, but did not create it. *Id.* at 1080.

> the wording "or other insignia of the United States" must be restricted in its application to insignia of the same general class as "the flag or coats of arms" of the United States.  Since both the flag and coat or [sic] arms are emblems of national authority it seems evident that other insignia of national authority such as the Great Seal of the United States, the Presidential Seal, and seals of government departments would be equally prohibited registration under Section 2(b).  On the other hand, it appears equally evident that department insignia which are merely used to identify a service or facility of the Government are not insignia of national authority and that they therefore do not fall within the general prohibitions of this section of the Statute.

*Dep't of the Interior*, 142 USPQ at 507.  We concluded that the National Park Service logo at issue was not of a type that was prohibited registration under Trademark Act § 2(b).

By contrast, in the case at bar, applicant does not deny that the applied-for mark is its official seal, and thus an emblem of authority of the Government of the District of Columbia, or that it is "of the same general class" as, for instance, the Great Seal of the United States, albeit on a municipal, rather than national level. Applicant frankly admits "[i]t is undisputed that Applicant seeks to register its own official seal."  App. Reply Br. at 1.  This case is not about whether applicant may register *any* mark under Trademark Act § 2(b); clearly governments are not prohibited as a class from seeking any

32

registration.  Rather, the issue before us is whether applicant may register its official seal.  Our decision in *Department of the Interior* does not directly answer the question, but in any event, it is clearly neither inconsistent with the refusal in this case,[18] nor does it somehow create ambiguity in the statutory language itself.

Similarly, the actions of examining attorneys in approving the marks in the three registrations applicant submitted on remand did not create any ambiguity in the language of the statute, nor do they provide applicant with any right to register its own mark.  The three registrations of record appear to be the official seals[19] of the City of Atlanta, Georgia, Reg. No. 3089604 (registered May 9, 2006), the City of Scottsdale, Arizona, Reg. No. 3263901 (registered July 17, 2007), and the Town of Miami Lakes Florida, Reg. No. 3480633 (registered Aug. 5, 2008).

---

[18] In *Department of the Interior*, the Board drew a distinction between insignia like the flag or Great Seal on the one hand, and marks used by governments "merely ... to identify a service or facility of the Government" on the other, allowing registration by the government only of the latter. *Dep't of the Interior*, 142 USPQ at 507.  Under applicant's reading of Trademark Act § 2(b), *all* insignia used by governments would be registrable by them, rendering the analysis in *Department of the Interior* pointless, as a government would be permitted to register its official indicia even if it were akin to the flag or Great Seal.

[19] We assume for the sake of argument that each of these marks comprises the official seal of the municipality which is the named registrant.  *See* Resp. to Office Action, Attachment B (Sept. 16, 2009).

Although applicant urges that the seeming inconsistency of registering these three marks has rendered the statute ambiguous, arguments based on alleged examining inconsistencies have been routinely rejected:

> Needless to say, this court encourages the PTO to achieve a uniform standard for assessing registrability of marks. Nonetheless, the Board (and this court in its limited review) must assess each mark on the record of public perception submitted with the application. Accordingly, this court finds little persuasive value in the registrations that Nett Designs submitted to the examiner or in the list of registered marks Nett Designs attempted to submit to the Board.

*In re Nett Designs Inc.*, 236 F.3d 1339, 57 USPQ2d 1564, 1566 (Fed. Cir. 2001); *see also In re Rodale Inc.*, 80 USPQ2d 1696, 1700 (TTAB 2006) ("Although consistency in examination is a goal of the Office, the decisions of previous Trademark Examining Attorneys are not binding on us, and we must decide each case based on the evidence presented in the record before us"); *In re Finisair Corp.*, 78 USPQ2d 1618, 1621 (TTAB 2006); *In re Wilson*, 57 USPQ2d 1863 (TTAB 2001) (administrative law doctrine of "reasoned decisionmaking" does not require consistent treatment of all applications to register marks; each application for registration must be considered on its own record and merits). Simply put, the goal of consistency does not require that we ignore a statutory directive. "Even if all

34

of the third-party registrations should have been refused

registration ..., such errors do not bind the USPTO to

improperly register Applicant's marks." *In re Shinnecock*

*Smoke Shop*, 571 F.2d 1171, 91 USPQ2d 1218, 1221 (Fed. Cir.

2009) (*citing In re Boulevard Entm't*, 334 F.3d 1336, 67

USPQ2d 1475, 1480 (Fed. Cir. 2003)).

Applicant's arguments fare no better in this case.

The registration of three marks comprising official seals

of municipalities neither renders the statute unclear nor

provides applicant any rights based on them.[20]  Each

application must be examined on its own merits, based on

the administrative record.

Applicant further argues that even if the statute is

unambiguous, we should look to its legislative history

---

[20] To the extent applicant is arguing that registration of what appear to be official insignia of three other governmental entities is *evidence* of the ambiguity of the statute, we again disagree.  As noted at the outset, this is a case of first impression, and we have not previously had the opportunity to offer guidance to the examining corps on this issue.  We make no comment on the validity of these third-party registrations.  But even if it could be argued that they were incorrectly registered, we cannot tell on this record whether they were approved as a result of incorrect legal interpretation of Trademark Act § 2(b), as the result of inadvertent error, or for some other reason not apparent on this record.

But whatever the explanation, the existence of three seemingly inconsistent registrations is of little significance, and certainly does not provide evidence that the statute is constitutionally ambiguous.  Consistency is a worthy goal, but absolute consistency – even in well-trod areas of the law – may be a practical impossibility.

anyway, because to do otherwise would lead to absurd and unconstitutional results, arguing that "the Examining Attorney's interpretation of Section 2(b) cannot be reconciled with the rights and obligations negotiated in the Paris Convention or the legislative history of the legislation that sought to implement those rights and obligations."

Applicant's argument is based on a faulty premise. As discussed above, the Paris Convention does not *require* registration of applicant's mark.[21] Indeed, at the time Congress passed the 1905 Act, the Paris Convention clearly contemplated a prohibition on the registration of all official insignia. The exception permitting member countries to allow such registrations with governmental consent appeared first in the Washington revisions of 1911 – *after* the passage of the 1905 Act. But notwithstanding

---

[21] Even if the Paris Convention were self-executing, applicant, as a U.S. national, could not claim any benefit from it, because the Convention does not address a country's treatment of its own nationals. Paris Convention (Stockholm Act), art. 1(1) ("Nationals of any country of the Union shall ... enjoy in all the *other* countries *of the Union* the advantages that their respective laws now grant, or may hereafter grant, to nationals...." (emphasis added)). "The protection of a national in his own country depends on the domestic legislation of that country and such national will therefore not be able to claim application of the Convention in his own country unless its legislation entitles him to do so." G.H.C. BODENHAUSEN, GUIDE TO THE APPLICATION OF THE PARIS CONVENTION FOR THE PROTECTION OF INDUSTRIAL PROPERTY, 30-31 (1969).

the revision to the Paris Convention a century ago, the U.S. law has not been amended accordingly, and in fact the 1946 Act carried forward the text of the 1905 Act in this regard with no significant change.

And even if we do consider the history of the 1905 Act, applicant has pointed to nothing approaching a clear statement that such marks must (or even may) be registered notwithstanding the language of the statute. Applicant points only to general statements consistent with the notion that the relevant portion of the 1905 Act was adopted in whole or in part to comply with our obligations under the then-current (1883) text of the Paris Convention, that the central concern of Trademark Act § 2 is the prevention of source confusion, and that the statute was generally intended to allow registration of matter considered a common-law trademark.[22] But none of that is an indication that Congress meant something other than what it

---

[22] These vague and general statements were not made with specific reference to the prohibition on registration of official insignia. Indeed, applicant has cited no discussion in legislative hearings, speeches, debates, committee reports, or the like of this specific provision in the legislative history of either Section 5 of the 1905 Act or the current Trademark Act § 2(b), and we have not been able to find any. The prohibition appears to have been uncontroversial, first appearing in proposed legislation prior to the 1905 Act, S. Rep. No. 56-20, at 127 (1900), and later in proposals leading to the 1946 Act, *e.g.*, H.R. 9041, 75th Cong. § 3(b) (1938), all without significant change and with virtually no discussion.

37

said, either in Section 5 of the 1905 Act or when virtually the same language was carried forward into Section 2(b) of the 1946 Act. Applicant has not pointed to any legislative history indicating Congress' specific intent regarding Trademark Act § 2(b), and in particular, no clear indication that it was not intended to apply to governments seeking to register their own official insignia. The general statements cited by applicant do not contradict the clear language of the statute.

### 3. Constitutional Arguments

Finally, applicant argues that Trademark Act § 2(b) is unconstitutional first, because it denies applicant its Fifth Amendment right to equal protection

> by creating an arbitrary distinction between municipal corporations and other juristic persons with regard to their rights to protection of their insignia as commercial identifiers under U.S. trademark law. All other juristic persons ... may, subject to other provisions of the Lanham Act, register the "house" mark and/or logo that is their primary identifier as a commercial entity. ... But under the Examiner's interpretation of Section 2(b), the District of Columbia, and purportedly all other municipal corporations, would be arbitrarily denied the right to register their official seals and flags as house marks that otherwise would also serve as their primary commercial identifiers and would be thus precluded from securing the benefits of a federally registered mark.

App. Br. at 11. Second, applicant argues that refusal of its application unconstitutionally discriminates against it

in view of the third-party registrations of others which have been allowed.

With respect to applicant's first argument, we note that Trademark Act § 2(b) does not single out applicant or other municipal corporations. Under Section 2(b) <u>all</u> persons (including governments and other juristic persons such as applicant) are prohibited from registering "the flag or coat of arms or other insignia of the United States, or of any State or municipality, or of any foreign nation, or any simulation thereof." All applicants are treated equally under this provision.[23] Moreover, Section 2(b) in no way prevents applicant from registering other marks, which are not official insignia. *See Dep't of the Interior*, 142 USPQ at 507 (construing Trademark Act § 2(b) narrowly, applying only to emblems of authority akin to "the Great Seal of the United States, the Presidential Seal, and seals of government departments"). And in regard to applicant's second argument, we have already explained that inconsistent treatment by examining attorneys does not

---

[23] Applicant calls this position taken by the examining attorney "ridiculous." Reply Br. at 14. Neither applicant's argument nor its rhetoric are convincing. Applicant contends that "[t]hird parties have no conceivable right to register the official insignia of municipalities; the municipalities do." *Id*. But applicant again ignores the plain language of Trademark Act § 2(b), which provides that *no one* has a right to register the official insignia of municipalities.

allow, let alone require, us to ignore or rewrite the law as applicant urges.

More importantly, we cannot rule on applicant's constitutional arguments. The Trademark Trial and Appeal Board is an administrative tribunal, not an Article III court, and we have no authority to declare provisions of the Trademark Act unconstitutional. *E.g., Harjo v. Pro-Football, Inc*., 50 USPQ2d 1705, 1710 (TTAB 1999) (no authority to declare provisions of the Trademark Act unconstitutional nor to determine whether Trademark Act § 2(a) is overbroad or vague), *rev'd on other grounds*, 284 F. Supp. 2d 96, 68 USPQ2d 1225 (D.D.C. 2003) (subsequent history omitted); *Zirco Corp. v. Am. Tel. and Tel. Co*., 21 USPQ2d 1542, 1544 (TTAB 1991) (no jurisdiction to determine whether Trademark Act § 7(c) violates the commerce clause of the constitution); *Hawaiian Host, Inc. v. Rowntree MacKintosh* PLC, 225 USPQ 628, 630 (TTAB 1985) (no authority to declare Trademark Act § 44(e) unconstitutional); *Elec. Storage Battery Co. v. Mine Safety Appliances Co*., 143 USPQ 163, 167 (TTAB 1964) (no authority to find Trademark Act § 23 unconstitutional).[24] Thus, to the extent applicant

---

[24] The Court of Appeals for the Federal Circuit, which is an Article III court, and whose decisions are binding on us, has

argues that such insignia are the equivalent of trademarks and that under Trademark Act § 2(b) it is not treated equally, in that other trademark owners are allowed to register their own trademarks, we do not have the authority to determine whether such treatment renders the section unconstitutional.

## III. Conclusion

We end up where we began – with the words of the statute. Those words provide that registration is to be refused if the applied-for mark "[c]onsists of or comprises the flag or coat of arms or other insignia of the United States, or of any State or municipality, or of any foreign nation, or any simulation thereof." There is no dispute (and we have no doubt) that applicant's applied-for mark comprises its official seal, and is therefore a "coat of

---

squarely rejected similar due process and equal protection arguments:

> [Applicant] was provided a full opportunity to prosecute its applications and to appeal the examining attorney's final rejections to the Board. The Board fully considered [applicant's] arguments and affirmed the rejection in a detailed written decision setting forth the reasons for the rejection. More importantly, [applicant] has not demonstrated that it has a constitutionally protected property interest in obtaining federal registration of its ... marks. There is no constitutionally protected right to federal registration of any mark. ... Furthermore, [applicant] was not denied equal protection. Each application for trademark registration must be considered on its own merits.

*In re Int'l Flavors & Fragrances Inc*., 51 USPQ2d 1513, 1518 (Fed. Cir. 1999).

arms or other insignia of ... [a] State or municipality." Although we have considered them fully, none of applicant's various arguments convince us that the language of Trademark Act § 2(b) should be given anything but its plain and ordinary meaning, *i.e.*, that official government insignia must be refused registration, regardless of the identity of the applicant.

This case is not about what the law should be or what it might be, but what it is. We are not free to disregard the plain meaning of the statute or to read into it an exception that is not provided for under a plain reading of it. The remedy that applicant seeks is a matter that might be addressed legislatively, but we have no authority to change the words of the statute.

We have carefully considered all of the evidence and argument of record, including any which we have not specifically discussed in this opinion. We conclude that registration of the mark depicted in the subject application is barred by Trademark Act § 2(b).

*Decision:* The refusal to register is AFFIRMED.